631 F.2d 1059
 NEW YORK TELEPHONE COMPANY, Petitioner,
New York State Public Service Commission and Rochester
Telephone Corporation, Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Aeronautical Radio, Inc., General Electric Company, New York
State Council of Retail Merchants, United States
Transmission Systems, Inc., ITT-Domestic Transmission
Systems, Inc., Southern Pacific Communications Company, Intervenors.
 No. 1137, Docket 80-4047.
 United States Court of Appeals,
Second Circuit.
 Argued June 18, 1980.
Decided Sept. 17, 1980.
 
 Guy Miller Struve, New York City (James L. Kerr, Robert F. D'Emilia, Davis, Polk & Wardwell, George E. Ashley, Raymond F. Burke, John M. Clarke, New York City, on brief), for petitioner.
 Charles R. Gibson, Albany, N.Y. (Peter H. Schiff, Albany, N.Y., on brief), for intervenor New York State Public Service Commission.
 Michael T. Tomaino, Rochester, N.Y. (Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., on brief), for intervenor Rochester Telephone Corporation.
 Jack David Smith, Washington, D.C. (Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D.C., Sanford M. Litvack, Asst. Atty. Gen., Robert B. Nicholson, Peter L. Delacruz, U. S. Dept. of Justice, Washington, D.C., on brief), for respondents.
 
 
 1
 Townley & Updike, New York City, Charles R. Cutler, John L. Bartlett, Michael Yourshaw, Rodney L. Joyce, John C. Smith, Kirkland & Ellis, Washington D.C., on brief, for intervenor Aeronautical Radio, Inc.
 
 
 2
 Joseph M. Kittner, Washington, D.C. (Virginia S. Carson, McKenna, Wilkinson & Kittner, Washington, D.C., Richard A. Fazzone, Schenectady, N.Y, on brief), for intervenors General Electric Company and New York State Council of Retail Merchants.
 
 
 3
 Grant S. Lewis, New York City (John S. Kinzey, Diane K. Newman, LeBoeuf, Lamb, Leiby & MacRae, Joseph J. Jacobs, Peter M. Andersen, Randall B. Lowe, Howard G. Kristol, Robert L. Sills, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, on brief), for intervenors United States Transmission Systems, Inc., ITT Domestic Transmission Systems, Inc., and Southern Pacific Communications Company.
 
 
 4
 Before OAKES and MESKILL, Circuit Judges, and NEAHER, District Judge.*
 
 OAKES, Circuit Judge:
 
 5
 New York Telephone Company (NYT), by this petition to review, seeks to overturn an order of the Federal Communications Commission (FCC) asserting jurisdiction over local exchange service when used in connection with interstate foreign exchange (FX)[1] and common control switching arrangement (CCSA)[2] services. The order also required that any charges concerning the local distribution of FX and CCSA services that apply only to interstate customers must be filed with the FCC pursuant to section 203 of the Communications Act of 1934, 47 U.S.C. § 203.
 
 
 6
 NYT had, at the suggestion of the New York State Public Service Commission (PSC), filed a tariff with the PSC to recover $39.867 million in annual revenue requirements associated with local telephone exchange service accessed by interstate FX and CCSA lines. NYT was to collect the $39.867 million solely from interstate FX/CCSA customers because the PSC, over a sharp dissent, had ordered that these previously local exchange costs be reclassified as interstate costs. When the FCC disallowed this tariff, NYT found itself a stakeholder in what appears at first blush to be a jurisdictional dispute between the PSC and the FCC.
 
 
 7
 NYT has sought to fight the PSC in the state courts and the FCC in the federal courts. NYT argues here that the FCC cannot preempt a charge provided for in a state tariff without at the same time making effective an alternative tariff providing for such a charge; that the FCC's reversal of prior precedents was unlawful, arbitrary, capricious, and an abuse of discretion; and that the FCC has no right to cancel a tariff presently in effect with the FCC without making a finding after notice and hearing that the tariff on file is unjust or unreasonable. We hold that the FCC had jurisdiction over local exchange service when used in connection with interstate FX and CCSA services, and that the FCC could properly forbid NYT from collecting the charge in question pursuant to the tariff filed with the PSC.
 
 I. FACTUAL BACKGROUND
 
 8
 A. Telephone Industry Separations Procedures
 
 
 9
 Originally, local telephone companies did not receive any compensation from long distance carriers for originating or terminating calls. In Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 149-51, 51 S.Ct. 65, 69-70, 75 L.Ed. 255 (1930), however, the Supreme Court held that the rate base and expenses of a telephone company must be allocated between interstate and intrastate uses for purposes of fixing just and reasonable rates for interstate and intrastate telephone service. Faced with the problems such allocation presented, the telephone companies, state public utility commissions, and federal agencies came to an accommodation in the form of a "Separations Manual" standardizing allocations procedures. The Manual, which is published by the National Association of Regulatory Utility Commissioners (NARUC) and approved by the FCC, has been revised and is incorporated into the FCC's rules, 47 C.F.R. § 67.1 (1979). See Jurisdictional Separations of Telephone Companies, 16 F.C.C.2d 317, 331 (1969). In 1970 it was revised pursuant to the "Ozark Plan," which was recommended by a Federal-State Joint Board convened under section 410(a) of the Communications Act of 1934, 47 U.S.C. § 410(a). See Separation Procedures, 26 F.C.C.2d 247 (1970).
 
 
 10
 Under section 410(c) of the Communications Act, 47 U.S.C. § 410(c), the FCC is required to refer any rulemaking proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations to a Federal-State Joint Board for a recommended decision. See S.Rep.No.362, 92d Cong., 1st Sess. 5 (1971), reprinted in (1971) 2 U.S.Code Cong. & Admin.News, pp. 1511, 1515 (statute achieves "joint participation without abandoning Federal superintendence in the field"). Under the separation procedures, AT&T and several other large independent telephone companies provide long-distance public services like MTS (message toll service), which is the regular long distance service available to every home subscriber, and WATS (wide area telecommunication service), which allows business and government subscribers to make interstate calls at fixed volume rates, and the Manual designates a portion of the local exchange costs to be borne by those services. Interstate FX and CCSA private lines, however, are treated differently. Their costs have been assigned wholly to interstate revenue requirements, while the costs of the local exchange service accessed by such lines have been assigned wholly to intrastate revenue requirements.[3] Thus business subscribers to FX/CCSA pay one bill for their private line and another bill for the business local exchange service in the area accessed by that line.
 
 
 11
 Recently, the so-called Execunet decisions,[4] opening up toll services to specialized common carriers, led the FCC to accept an agreement negotiated between AT&T and other telephone company representatives, and the major specialized carriers, which established temporary arrangements for the use of local facilities. See Exchange Network Facilities for Interstate Access (ENFIA), 71 F.C.C.2d 440 (1979). This ENFIA agreement provides "rough justice" for services like MTS and WATS until other compensation arrangements can be prescribed. As for FX and CCSA, the Commission said that "some form of rulemaking or interpretive proceeding would appear necessary," id. at 457, and has recently put forth a tentative plan for prescribing arrangements to compensate local exchange carriers for these and other interstate services by determining the amounts interstate exchange carriers will pay for the use of exchange plant to originate and terminate interstate traffic.[5]
 
 B. The New York State PSC Proceedings
 
 12
 In December 1978 NYT filed a request for a $240.3 million intrastate revenue increase for the twelve-month period ending November 30, 1980, and the New York PSC investigated this request. The PSC staff recommended that $39.867 million of local exchange costs be reclassified as interstate costs associated with interstate FX and CCSA services. Evidently the staff thought that FX and CCSA were comparable to MTS and WATS services and should be allocated a share of the cost of local exchange facilities as in the case of MTS and WATS. In an evidentiary hearing before two state administrative law judges, NYT opposed this change and argued that Congress had vested preemptive authority over the federal-state allocation of joint interstate-intrastate plant in the FCC. See New York Telephone Co. (Recommended Decision), NYPSC 27469, at 88 (Aug. 13, 1979). Although the judges' decision supported NYT, the PSC overturned their ruling and agreed with its staff that interstate FX/CCSA services should be required to bear a share of the costs of local exchange plant computed upon the same basis as the Separations Manual provided for MTS and WATS. See New York Telephone Co. (Final Decision), NYPSC Case 27469, at 25 (Nov. 9, 1979). The PSC gave the telephone company the option of filing a tariff with the PSC to cover the identified costs from FX/CCSA subscribers, thus permitting the PSC to order intrastate toll and message unit decreases totaling almost $40 million on an annual basis. As a result of the PSC order, interstate FX and CCSA subscribers were to be charged with this $40 million while intrastate FX and CCSA subscribers continued to pay a low rate for their local exchange service. A dissenting Commissioner to the PSC order argued that the majority decision was in breach of the agreement entered into by the States with the FCC.
 
 
 13
 On December 4, 1979, NYT filed the tariff revisions which are now in question with the PSC. These require the interstate FX/CCSA customers to pay a much higher surcharge, in addition to the local service charge, then the intrastate FX/CCSA customers. The surcharge for interstate FX/CCSA users is to be $75 monthly, as of February 1, 1980, and $160 a month as of September 1, 1980,[6] while the surcharge for intrastate FX/CCSA users remains at $9.23 per month. The PSC approved these new surcharges. Meanwhile, several FX/CCSA users and competitors filed complaints with the United States District Court for the Southern District of New York, requesting the court to enjoin NYT from collecting the surcharge in absence of a lawful tariff filed with the FCC. United States Transmissions Systems, Inc. v. New York Telephone Co., 80 Civ. 0633 (S.D.N.Y., filed Jan. 31, 1980). By stipulations these matters are held in abeyance pending the outcome of this case.
 
 C. FCC Action
 
 14
 The FCC wrote to NYT as soon as it heard about the December 4, 1979, tariff and NYT responded by letter that it had not made a comparable filing with the FCC because the rate revision concerns only local service and rates, and because local exchange costs are now "treated as intrastate by current NARUC-FCC Separations Procedures." Thereafter General Electric Company and the New York State Council of Retail Merchants filed a petition for relief with the FCC, as did various other parties interested as customers of FX or CCSA services. They are intervenors here.[7]
 
 
 15
 On March 12, 1980, the FCC, over NYT's opposition, released its Memorandum Opinion and Order, 76 F.C.C.2d 349. The order recognized that in the past the FCC had not asserted jurisdiction over local exchange service when used in connection with interstate FX and CCSA services, but stated that the Commission was doing so now because the New York PSC imposed a substantial surcharge only upon interstate users. The FCC therefore ordered that "any charges concerning the local distribution of FX and CCSA services that apply to interstate customers only" are subject to FCC jurisdiction and must be filed with the Commission under section 203 of the Communications Act, 47 U.S.C. § 203, 76 F.C.C.2d at 354-55.
 
 
 16
 Meanwhile, California and Missouri had taken somewhat similar action to that of New York, but upon the filing of the FCC order at issue here those states rescinded their actions and instructed their local utilities not to treat interstate users of FX and CCSA differently from intrastate users.[8]
 
 II. DISCUSSION
 A. Jurisdiction
 
 17
 Intervenor Rochester Telephone Corporation, a publicly-owned, independent telephone company serving the Rochester, New York exchange area, argues that the FCC exercise of jurisdiction violated section 2(b)(1) of the Communications Act, 47 U.S.C. § 152(b)(1). Neither NYT nor the PSC made this argument.
 
 
 18
 The Act, after stating that the "provisions of this chapter shall apply to all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(a), provides that
 
 
 19
 nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, ....
 
 
 20
 47 U.S.C. § 152(b) (emphasis added). Section 221 of the statute adds that
 
 
 21
 nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service, ... even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.
 
 
 22
 47 U.S.C. § 221(b). This latter provision, however, is intended only to cover the situation in which a local carrier serves a single multi-state exchange area, so that such carrier is assured whatever degree of freedom section 2(b) provides from federal regulation for unistate carriers. North Carolina Utilities Commission v. FCC, 537 F.2d 787, 795 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).
 
 
 23
 Rochester Telephone argues that, both factually and legally, the local exchange part of FX and CCSA service is separable and, therefore, falls outside FCC jurisdiction and within state regulation. 47 U.S.C. §§ 152(b), 221(b). Rochester points to a series of the FCC's own opinions dealing peripherally with FX in which the FCC held that regulatory jurisdiction over FX service was divided, with federal jurisdiction over the interstate portion and state jurisdiction over the local exchange service. See, e. g., Southern Pacific Communications Co., 67 F.C.C.2d 1569, 1575 n.9 (1978); Southern Pacific Communications Co., 61 F.C.C.2d 144, 146-47 (1976); MCA Telecommunications Corp., 61 F.C.C.2d 131, 134 n.12 (1976). The FCC described FX as
 
 
 24
 private line service which gives the customer "access" to a distant local exchange but does not include the local exchange service as part of its offering of service. The private line carrier may procure local exchange service as an agent for his FX customer, but he does not offer the use of exchange facilities as a part of his FX service.
 
 
 25
 Id. at 134.
 
 
 26
 But the FCC did state in one prior decision, when discussing interstate versus intrastate services, that "(w)hile the States clearly have the authority to regulate the local exchange service pursuant to Sections 2(b) and 221(b), they cannot in so doing block interstate commerce by prohibiting interstate access to foreign exchanges or by discriminating against or among interstate services." American Telephone & Telegraph Co., 56 F.C.C.2d 14, 20 n.5 (1975), aff'd sub nom. California v. FCC, 567 F.2d 84 (D.C.Cir.1977), cert. denied, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978) (emphasis added). The FCC thus reserved its ability to regulate local exchange service in situations in which there is discrimination against interstate services. Although subsequent FCC cases do not mention this reservation, which supports the exercise of jurisdiction here, the MCI Telecommunications Corp. opinion does cite to the AT&T case, 61 F.C.C.2d at 133 nn.7 & 9.
 
 
 27
 In any event, the FCC is not barred from overruling past precedents when it decides that a previously declared rule is no longer sound or appropriate. See K. Davis, Administrative Law Treatise § 17.07, at 526-28 (1958). The agency explains its reason for the change: "the authority to impose a charge of this nature on interstate users clearly extends beyond the realm of actions contemplated by our policy of deferring to state ratemaking jurisdiction," 76 F.C.C.2d at 354. Adequate explanation and reasoned analysis have been held sufficient to support departure by administrative agencies from their precedents. See Sirbo Holdings, Inc. v. Commissioner, 476 F.2d 981, 987 (2d Cir. 1973); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); K. Davis, Administrative Law of the Seventies § 17.07-4, at 413-17 (1976). In addition, if the exercise of jurisdiction by the FCC represents a change in its rules, the agency presaged this change in AT&T with its caveat about discrimination against interstate service. Cf. NLRB v. Kobritz, 193 F.2d 8, 13 (1st Cir. 1951) (upholding an NLRB departure from a policy of declining to assert jurisdiction, on the ground that "the Board had jurisdiction all the time"). The FCC's own construction of its enabling statute, even if it is a changing one, is entitled to deference from the courts. Diamond International Corp. v. FCC, 627 F.2d 489, at 492-93 (D.C.Cir.1980).
 
 
 28
 We believe that the general thrust of the statute and of the cases support FCC jurisdiction. The Act defines "wire communication" as "the transmission of ... sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services ... incidental to such transmission." 47 U.S.C. § 153(a) (emphasis added). It is no less logical to classify the individual telephone line as the point of reception in FX or CCSA systems than to define the local exchange service as that point. Even those FCC cases treating FX under the bifurcated jurisdictional view contain support for the assertion of jurisdiction because they note that "this Commission's jurisdiction over interstate communications does not end at the local switchboard, it continues to the transmission's ultimate destination." Southern Pacific Communications, 61 F.C.C.2d at 146. The key to jurisdiction is the nature of the communication itself rather than the physical location of the technology. United States v. Southwestern Cable Co., 392 U.S. 157, 168-69, 88 S.Ct. 1994, 2000-2001, 20 L.Ed.2d 1001 (1968); General Telephone Co. v. FCC, 413 F.2d 390, 401 (D.C.Cir.), cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). The calls for which the NYT-PSC surcharge is imposed clearly go from one state to another.
 
 
 29
 In North Carolina Utilities Commission v. FCC the court stated:
 
 
 30
 We have no doubt that the provisions of section 2(b) (47 U.S.C. § 152(b)) deprive the Commission of regulatory power over local services, facilities and disputes that in their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications. But beyond that, we are not persuaded that section 2(b) sanctions any state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority under sections 201 through 205.
 
 
 31
 537 F.2d at 793 (footnote omitted) (emphasis added). Even if the local exchange service is separable technologically and in terms of cost assessment from the dedicated private line in FX and CCSA service, there is no doubt that the NYT surcharge on interstate FX/CCSA users, ranging up to 1600% higher than the charge for comparable service to intrastate users, substantially affects the conduct or development of interstate communication and encroaches upon FCC authority. See Diamond International Corp. v. FCC, at 493 (citing the FCC order at issue here). Accordingly, we uphold the FCC's assertion of jurisdiction here.
 
 B. Preemption Only by FCC Tariff
 
 32
 NYT's main argument is that before the FCC can assert jurisdiction over NYT, the FCC must be prepared to make effective its own tariff substituting for the displaced state rate. That is to say, the agency may not "preempt state regulation without itself occupying the field by effective regulation." Brief of NYT at 16. The argument is based on the proposition that state regulation in a given field is not preempted by the mere fact that Congress has conferred upon a federal agency the authority to occupy that field. H. P. Welch Co. v. New Hampshire, 306 U.S. 79, 59 S.Ct. 438, 83 L.Ed. 500 (1939); Northwestern Bell Telephone Co. v. Nebraska State Railway Commission, 297 U.S. 471, 56 S.Ct. 536, 80 L.Ed. 810 (1936); Chrysler Corp. v. Tofany, 419 F.2d 499 (2d Cir. 1969).
 
 
 33
 Reliance on these principal cases is misplaced, however, for they each dealt with a situation in which Congress had given an agency power to regulate in a certain area, but the agency had not yet regulated in that area. Only in such situations have the courts stated that lack of federal regulation necessarily means that state regulation should continue unabated in order to prevent the existence of a regulatory void. In Northwestern Bell Telephone Co. v. Nebraska State Railway Commission, in which the appellant argued that the State Commission was powerless to regulate depreciation rates for telephone companies because Congress had turned over such authority to the ICC, the Court held that both the language of the statute and the nature of the subject matter indicated that Congress intended state regulation to continue until the ICC prescribed its own rates. At that time, the ICC had not yet set depreciation rates. 297 U.S. at 477-80, 56 S.Ct. at 538-539. In H. P. Welch Co. v. New Hampshire, again with an appellant arguing that state regulations were invalid, the Court held that "it cannot be inferred that Congress intended to supersede any state safety measure prior to the taking effect of a federal measure found suitable to put in its place." 306 U.S. at 85, 59 S.Ct. at 441. Once more, though, the ICC had not yet acted in the area. Finally, in Chrysler Corp. v. Tofany, this court held that the federal statute directing the Department of Transportation to establish federal traffic safety standards for new equipment had no preemptive effect until such standards were in fact promulgated. 419 F.2d at 506-07.
 
 
 34
 Here, in contrast, what the FCC has done in its March 12, 1980, order is precisely what the courts above found lacking when they upheld those state regulations. The agency has not simply invalidated state regulation without substituting its own. Instead, the FCC has ruled that NYT must file tariffs with the FCC if NYT charges discriminatory rates for interstate FX and CCSA users. This FCC pronouncement is just the sort of regulation contemplated under the Communications Act. The rule does not create a regulatory vacuum, and NYT is not forced to forfeit recovery of its $39.867 million in costs. All the FCC's order really says is that the rate NYT wants to charge interstate FX/CCSA users may not be levied without FCC approval. However, NYT is free to go back to the PSC and ask for an appropriate nondiscriminatory tariff to cover its costs. This is exactly what the Bell Telephone affiliates in California and Missouri did, with the approval of the public utility commissions in those states, following the FCC's order of March 12, 1980. Thus, NYT could request a surcharge on FX and CCSA users that is the same for both interstate and intrastate users, presumably without instigating FCC regulation, or NYT could charge all New York state ratepayers a flat fee.
 
 
 35
 NYT argues that only a federally-approved tariff can constitute regulation. If this were the case, however, any time a state wanted to shift part of the rate burden away from state ratepayers, it could invalidate an existing state tariff and substitute for it a new tariff only on interstate service. According to NYT's argument, the FCC could not invalidate the NYT-PSC surcharge until it approved a new tariff covering NYT's revenue requirement. But this is simply not the rate separations scheme contemplated by the Act, which "must be construed in light of the needs for comprehensive regulation and the practical difficulties inhering in state by state regulation of parts of an organic whole." General Telephone Co. v. FCC, 413 F.2d at 398. See also North Carolina Utilities Commission v. FCC, 537 F.2d at 795-96. In what is evidently an attempt by the PSC to force changes in national separations procedures, which the FCC already contemplates revising and which will be the subject of investigation and rulemaking, the PSC has put NYT in a difficult position, to be sure, but also has forced the FCC to act to protect interstate FX/CCSA users from discrimination.
 
 C. Remaining Arguments
 
 36
 NYT argues that the FCC action would long postpone NYT's right to recover $39.867 million in annual revenue requirements, until after FCC rulemaking and Joint Board proceedings, and that the agency's action is arbitrary, capricious, and an abuse of discretion. But the FCC action does not by itself prevent NYT from recovering its money, since as noted above the PSC may still authorize NYT either to charge interstate and intrastate FX and CCSA users the same rate, or to place a flat surcharge on all New York ratepayers.
 
 
 37
 NYT's principal argument as to arbitrariness is that the FCC action disallowing the state tariff is a sharp reversal of policy and, therefore, must not be given retroactive effect. But footnote 5 in American Telephone & Telegraph Co., 56 F.C.C.2d at 20, indicated in 1975 that discriminatory treatment by state regulators toward interstate users would result in FCC oversight of local exchange services. Regarding the retroactive application of a change in administrative policy, Retail, Wholesale and Department Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972), lists five factors for a court to consider. They are:
 
 
 38
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 39
 See Lodges 743 and 1746, IAM v. United Aircraft Corp., 534 F.2d 422, 452-53 (2d Cir. 1975), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). They lead to the conclusion to allow retroactivity here. See also Davis, Administrative Law Treatise, supra § 17.07, at 526-27.
 
 
 40
 Reliance by NYT on previous FCC rulings could hardly have been great because in NYT's appearance before the PSC, NYT itself expressed doubt about the authority of the PSC to establish the charge in question and fear that the PSC staff's proposal "was a certain prescription for confiscation," Petition for Rehearing filed Dec. 11, 1979, in New York Telephone Co., NYPSC 27469, at 55. Most importantly, it was the PSC's action which precipitated the FCC's ruling. And, as already mentioned, the burden of the FCC decision need not rest on NYT if the PSC approves a new tariff. All of these factors distinguish this case from National Association of Independent Television Producers and Distributors v. FCC, 502 F.2d 249 (2d Cir. 1974), in which the court would not allow an FCC rule amendment to go into effect until a reasonable time to plan adjustments, well beyond the thirty days required by statute, had passed. Regarding the thirty-day notice requirement in the instant case, set out in 47 U.S.C. § 408 and allegedly violated by the FCC's order which took effect immediately, this point is moot because many more than thirty days have now expired.
 
 
 41
 Finally, NYT argues that the FCC seeks to abrogate the tariff currently on file with the FCC, and that the Commission may not do so without a "full opportunity for hearing" under 47 U.S.C. § 205(a). However, this issue was apparently never raised in proceedings before the FCC and therefore should probably not be entertained here until the FCC has a chance to consider the question. See 47 U.S.C. § 405 (prohibiting judicial review of a legal issue never before the Commission); Gross v. FCC, 480 F.2d 1288, 1290 n.5 (2d Cir. 1973). Even if we overlook this salutary rule, we still disagree with NYT. The Tariff FCC No. 260 specifies the rates for the private-line portion of FX/CCSA calls and, in addition, provides that the "regulations and rates specified in the general and local exchange service tariffs of the (local) Telephone Company" will apply to the local exchange portion. The NYT tariff on file with the PSC states that "(f)or foreign exchange service, the following charges apply in addition to the local service charge for each line or trunk served from a New York Telephone Company central office," (emphasis added). Since the NYT-PSC tariff suggests that the FX rate is a special surcharge not part of the basic local service charge generally applicable to all customers, it is hard to understand how NYT can now argue that the FX tariff is on file with the FCC.
 
 
 42
 In the final analysis, as at first blush, this case is really an administrative jurisdictional dispute, with NYT and interstate FX and CCSA users to some extent caught in the middle. Upholding the FCC order, we force NYT to go back to the state for a new tariff that is consistent with the FCC's March 12 order, as the telephone companies have done in the California and Missouri cases. Of course, NYT may instead file a new tariff with the FCC, but the future Joint Board proceedings on all separations procedures may delay approval for at least a year. To hold otherwise in this case would permit the PSC to export intrastate telephone costs to interstate users until separations procedures have been revised and all interests accommodated. In the words of a dissenting PSC member, "(u)niformity in procedures used to allocate costs among the many jurisdictions involved is vital," in fairness to telephone company and ratepayer alike. NYPSC 27469, at 6 (Larkin, Comm'r, dissenting). The FCC appears to be seeking such "separations" uniformity in an orderly way, used successfully for more than thirty years, which saves state and private parties alike considerable litigation expense. The PSC order abrogated by the FCC order which we affirm would do just the opposite.
 
 
 43
 Petition to review denied.
 
 
 
 *
 Of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Foreign exchange service permits a customer in one city to obtain local business line service in a distant city or exchange area without incurring a toll charge. Service is obtained by leasing a full-time, point-to-point private line channel. Thus a person in Paramus, New Jersey, or in Syracuse, New York, who is linked to New York City, may call any local New York City number, and in turn may be called on a New York City number, for a local charge
 
 
 [2]
 Common control switching arrangement service permits a large customer through his own network of private lines to dial all stations in the network or to dial off-network telephone subscribers through interconnection with local exchange service, FX, or WATS lines. We are concerned here only with CCSA interconnection with local exchange service
 
 
 [3]
 Intrastate FX lines have been under either FCC or state jurisdiction depending on the nature of the network. Until this case the charges for the use of a local exchange service accessed by intrastate FX lines have traditionally been the same as the charges for that local service accessed by interstate FX lines
 
 
 [4]
 MCI Telecommunications Corp. v. FCC, 580 F.2d 590 (D.C. Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978); MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C. Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978)
 
 
 [5]
 MTS and WATS Market Structure, Second Supplemental Notice of Inquiry and Proposed Rulemaking, 77 FCC2d 224 (1980). Pending the rulemaking present separations procedures are to be followed, id. P 52. This is preliminary to revision of the Manual
 
 
 [6]
 There are 20,615 interstate FX/CCSA lines subject to the proposed charge, so the charge per line worked out to $160 per month. NYT sought the two-stage implementation of the access charge to prevent a sudden shift away from the service
 
 
 [7]
 The intervenors' principal argument has been that NYT has failed to exhaust administrative remedies. We need not reach this question in the light of our disposition of the case
 
 
 [8]
 Letter from California Public Utilities Comm'n to Pacific Telephone & Telegraph Co., Apr. 3, 1980, ordering company to file new plan not treating interstate users differently; Southwestern Bell Telephone Co., Missouri Public Service Comm'n No. TR-80-234 (Apr. 1980) (permitting levy of surcharge on all flat rate business services in the amount of $1.35 per line per month)